CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

9/30/2022

LAURA A. AUSTIN, CLERK
BY:  s/ CARMEN AMOS
      DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

TIMOTHY E. CLINTON and
JULIE A. CLINTON,

<em>Plaintiffs</em>,

v.

ALLSTATE VEHICLE & PROPERTY
INSURANCE COMPANY,

<em>Defendant</em>.

Case No. 6:21-cv-00036

**<u>MEMORANDUM OPINION</u>**

Judge Norman K. Moon

In this case, Defendant Allstate has filed a motion to exclude the testimony of Plaintiffs' expert as to the cause of damage to a chimney in their home, whether caused by a windstorm or long-term deterioration. Allstate argues that his testimony is inadmissible primarily because he lacked expertise to opine on moisture protection; and his opinion that a wind event "possibly" caused the chimney displacement was based on nothing more than speculation.

Allstate has also filed a motion for summary judgment, contending that Plaintiffs cannot prove that their home was damaged by a "fortuitous event"—a windstorm, as they claim—as required for the damage to be covered under the insurance policy. Allstate further argues that Plaintiffs cannot prove that the water intrusion into their home was "a fortuitous event not caused by the construction of the false chimney"; cannot prove that there was a wind event or when it was; and cannot prove that the damage was not caused by long-term moisture deterioration. Allstate has therefore asked the Court to exclude Plaintiffs' expert's testimony and to award summary judgment to Allstate.

For the reasons set forth below, the Court agrees with Allstate's position in both motions. Plaintiffs' expert's opinion fails to satisfy the reliability and admissibility requirements for expert opinions under *Daubert*. Further, Plaintiffs have not shown the existence of a genuine dispute of material fact such as would prevent issuance of summary judgment to Allstate. Accordingly, the Court will grant Allstate's motions and award it summary judgment.

**Motion to Exclude Expert Testimony**

<u>Background</u>

Defendant Allstate issued an insurance policy to Plaintiffs Timothy and Julie Clinton covering their property in Forest, Virginia. Dkt. 1-1 ("Compl.") ¶ 7; Dkt. 20-8 at 6 ("Policy"). Plaintiffs allege that in October 2020, a "windstorm" or "wind event" damaged their home, specifically displacing a "faux chimney," which Plaintiffs contend damaged their roof, caused a rafter to crack and formed an opening that allowed further water damage to the interior of the home. Compl. ¶ 8; Dkt. 22 at 1–2. On November 16, 2020, Plaintiffs notified Allstate of the loss which they stated occurred on November 11, 2020. Compl. ¶¶ 8–10; Dkt. 20-1 ("Notice of Loss"). After Allstate denied the claim, Plaintiffs filed this lawsuit, alleging that Allstate breached its contract by failing to provide full payment for the loss. Compl. ¶ 11.

Plaintiffs' house has a faux chimney on its roof. Dkt. 18-1 ("Parrish Rep.") at 1. The faux chimney is supported by 2x10 rafters. *Id.* Wire rope is attached at four locations to the bottom of the chimney and to the ceiling joist framing, which is designed to hold the faux chimney in place. *Id.*; *see also* Dkt. 23-4 ("Parrish Dep.") at 23. The roof is clad with asphalt shingles and oriented strand board ("OSB") sheathing. Parrish Rep. at 1. At the point where the faux chimney is attached to the roof, flashing fastened to the stucco-like material—an "exterior insulated finish

system" or "EIFS"—on the exterior of the faux chimney and to the sheathing, with shingles on top of the flashing. Parrish Dep. at 27; Parrish Rep. at 1.

On January 15, 2021, Plaintiffs' expert, structural engineer Randy Parrish, went to Plaintiffs' residence. There he conducted a "visual survey" (mostly from the underside of the roof) and took photos and measurements to confirm its condition. Parrish also viewed the exterior of the roof and chimney from a nearby deck, which was "[p]robably no more than 20 feet away." *See* Parrish Dep. at 13–14. Parrish wrote his report "based on observations made of readily accessible areas at the time of [his] visit, and a review of [Bennett Stewart's] report,"[1] however, he did not "access hidden areas, nor … take an[y] samples or perform any tests." Parrish Rep. at 1.

Parrish determined that the faux chimney "is out-of-plumb due to vertical deflection of one side of the chimney," which was "due to the failure of the OSB sheathing along one side of the chimney." *Id.* He further found it "obvious that the OSB [sheathing] has experienced long-term exposure to moisture." *Id.* In addition, Parrish "observed a longitudinal crack in the rafter adjacent to the damaged OSB [sheathing]," located at the "mid-span of the rafter." *Id.* Parrish wrote that "[t]he crack indicates a failure of the rafter." *Id.* Parrish also "observed some evidence (staining) of moisture intrusion along the top of the rafter," but "did not observe evidence of a compromise in the structural capacity of the rafter due to degradation from moisture." *Id.* Lastly, he "observed shingles and a window screen on a flat portion of the house roof adjacent to the

---

[1] Bennett Stewart was an engineer who drafted a report on behalf of Allstate, who concluded that the OSB sheathing had been subject to fungal decay, and that the weight of the chimney, plus the force of the rafter by the steel cables holding the chimney down, plus the failure of the OSB sheathing caused by long-term fungal decay, caused the failure of the rafter. *See* Dkt. 20 at 6.

sloped roof where the chimney is located," which he wrote "is a likely indication of a wind event." *Id.*

In Parrish's analysis, he calculated the "structural adequacy of the existing rafters" by "analy[zing] the rafters supporting the chimney." *Id.* at 2. He calculated the "rafters to be overstressed by approximately 32% over allowable [loads]," which he concluded meant "the existing rafters were more than adequate to support design Dead and Live Loads of the faux chimney." *Id.* Parrish therefore determined that, "[s]ince we have had no significant snow or seismic events in recent years, we conclude the damage to the roof sheathing and rafter were due to a wind event." *Id.* While Parrish noted that though Allstate's expert's report found "no significant wind events recorded in November 2020," he wrote that "does not eliminate the possibility of a local wind event or microburst in the [area] of the house." *Id.* In addition, Parrish noted that "a tree on the property was blown down," and that he had "observed shingles and a window screen on a flat roof of the house." *Id.* Accordingly, Parrish "conclude[d] that it is *certainly possible* that the chimney displaced due to wind, and this displacement damaged flashing, allowing water intrusion." *Id.* (emphasis added). Parrish also "disagree[d] that small cracks in the vertical surface" of the stucco-like finish on the exterior of the faux chimney "would allow enough water to contact the roof sheathing to cause the observed damage." *Id.*

Allstate has filed a motion to exclude the testimony of Plaintiff's expert, Mr. Parrish. Dkts. 17, 18. Allstate argues that Parrish's "entire opinion rests on his calculations that the rafters were adequate to support the load of the faux chimney," and that "[t]herefore, its failure had to be caused by a wind-event." Dkt. 18 at 7. However, Allstate contends that Parrish himself has admitted "he lacks the requisite expertise to opine on moisture protection issues," and that he has "blindly conclude[d] that a wind event was *possibly* the cause of the chimney displacement

event." *Id.* at 1–2. In other words, his determination that a wind event "possibly" caused the damage in October 2020 was based on his observations of January 2021 of some shingles and a screen lying on an adjacent roof, and Plaintiffs' report that a tree was blown down. *Id.* at 12. That conclusion, Allstate argues, is further undermined by Parrish's observation that it was "obvious" that the "OSB [sheathing] has experienced long-term exposure to water." *Id* at 13. Accordingly, Allstate contends, "Parrish [was] unable to determine exactly when the moisture intrusion began or how long it has been present," and thus it was "impossible for him to opine that the damage was not present before any wind event or that it was caused by a wind event." *Id.* at 13–14.

Allstate also critiques Parrish's opinion for not excluding other possible causes of roof damage, including that his calculations for the load the rafters were able to support did not account for forces exerted by the four cables attached to the faux chimney. *Id.* at 14–15. And, Allstate argues, Parrish's calculations were rendered unreliable because he did not properly inspect the faux chimney to determine its dimensions or the materials it was made of; and failed to account for other possible downward forces on the gables. *Id.* at 15–16. Lastly, Allstate contends that Parrish didn't present his conclusions to a reasonable degree of certainty, concluding merely that it was "certainly possible that the chimney displaced due to wind, and this displacement damaged flashing, allowing water intrusion." *Id.* at 17–18.

By contrast, Plaintiffs assert that Parrish employed "careful calculations utilizing accepted methods in the engineering field." Dkt. 22 at 2. Plaintiffs argue that, notwithstanding Allstate's argument, it did not matter that Parrish is not a moisture expert because "a moisture expert is not needed in this case," and "[t]his matter revolves around a structural issue." *Id.* at 4. Plaintiffs write that Parrish "concluded that the faux chimney was deflected as a result of a strong wind." *Id.* Plaintiffs further assert that Parrish had also "unequivocally state[d]" that the

"moisture spots" in the OSB sheathing "could have manifested themselves" between October and December 2020. Accordingly, Plaintiffs contend that Parrish "undoubtedly has the experience and personal knowledge to render an opinion that is accurate and reasonable." *Id.*

Plaintiffs also disagree that Parrish's conclusions were based on speculation, and instead assert they were "based on his personal knowledge and sound engineering judgment." *Id.* at 5. In support of that conclusion, they cite portions of a declaration attached to Plaintiffs' opposition brief. In that declaration, Parrish asserts that his belief that a "wind event" occurred causing the chimney displacement was based on his "personal knowledge of the damaged rafter," his interviews with Plaintiffs "concerning their personal knowledge of the windstorm event," and "my load calculations based on good engineering judgment." Dkt. 22-2 ("Parrish Decl.") ¶ 19; *see also, e.g.*, *id.* ¶¶ 11, 13, 17–19. In Plaintiffs' view, Parrish relied on such facts and data as he had been made aware of in forming his opinion, which suffices under Fed. R. Evid. 703. Dkt. 22 at 5–6. Plaintiffs also contend that Allstate's position that Parrish failed to consider additional forces exerted by the steel cables is not supported by the record. *Id.* at 6–7. Lastly, Plaintiffs contend that, taken as a whole, Parrish's testimony that the chimney displacement was caused by a wind event "is clear, unequivocal and based on sound personal experience and knowledge." *Id.* at 8–10.

<u>Applicable Law</u>

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Rule 702 provides that

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

6

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Under Rule 702 and pursuant to the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 789 (1993), the district courts have a "gatekeeping role" so that they may exclude unreliable expert testimony from the jury's consideration.[2] These principles apply to all proposed expert witnesses with specialized knowledge, not just those based on scientific knowledge. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). Expert testimony is admissible under Rule 702 "if it involves specialized knowledge that will assist the trier of fact in understanding the evidence or determining a fact in issue, and is both reliable and relevant." *United States v. Young*, 916 F.3d 368, 379 (4th Cir. 2019) (citing *Daubert*, 509 U.S. at 889–92). There is no requirement that the party seeking to introduce expert testimony "'prove' anything to the court before the testimony in question can be admitted," although, "[a]s in all questions of admissibility, the proffering party must come forward with evidence from which the court can determine that the proffered testimony is properly admissible." *Maryland Cas. Co. v. Therm-O-Disc, Inc.*, 137 F.3d 780, 783 (4th Cir. 1998).[3] Because the subject of an expert's testimony must be "scientific, technical, or other specialized knowledge," "subjective belief or unsupported speculation" will not suffice. *Daubert*, 509 U.S. at 589–90; *see also Bryte ex rel.*

---

[2] *See also* Fed. R. Evid. 702 advisory committee's note (2000 amends.) (explaining that the Rule 702 amendment "affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony").

[3] *See also* Fed. R. Evid. 702 advisory committee's note (2000 amends.) (explaining that "the admissibility of all expert testimony is governed by the principles of Rule 104(a)," and that, "[u]nder that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence").

*Bryte v. Am. Household, Inc.*, 429 F.3d 469, 477 (4th Cir. 2005) ("*Daubert* aims to prevent

expert speculation."). Rule 703 provides that "[a]n expert may base an opinion on facts or data in

the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. And

"if experts in the particular field would reasonably rely on those facts or data in forming an

opinion on the subject, they need not be admissible for the opinion to be admitted." *Id.*

When considering a challenge to the reliability of expert testimony, courts must consider

the following *Daubert* factors:

(1) whether a theory or technique can be or has been tested;

(2) whether it has been subjected to peer review and publication;

(3) whether a technique has a high known or potential rate of error and whether
there are standards controlling its operation; and

(4) whether the theory or technique enjoys general acceptance within a relevant
scientific community.

*Hickerson v. Yamaha Motor Corp.*, 882 F.3d 476, 480–81 (4th Cir. 2018) (quoting *Cooper v.*

*Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert*, 509 U.S. at 592–94)).

Moreover, while "there is no requirement that an expert use any 'magic words' for their opinion

to be admissible," still "the expert's testimony taken as a whole must still demonstrate that the

expert is confident in his or her opinion to a reasonable degree of certainty …." *Jordan v.*

*Iverson Mall, Ltd. P'ship*, No. 14-cv-37, 2018 WL 2391999, at *6 (D. Md. May 25, 2018).

District courts must be mindful of "two guiding, sometimes competing, principles" when

considering whether to allow expert testimony. *Westberry v. Gislaved Gummi AB*, 178 F.3d 257,

261 (4th Cir. 1999). First, "Rule 702 was intended to liberalize the introduction of relevant

expert evidence." *Id.* However, courts also must be cognizant that "[b]ecause expert witnesses

8

have the potential to be both powerful and quite misleading," testimony that "has a greater potential to mislead than to enlighten should be excluded." *Id.*

A district court's gatekeeping role "is not intended to serve as a replacement for the adversary system," and therefore "the rejection of expert testimony is the exception rather than the rule." *United States v. Smith*, 919 F.3d 825, 835 (4th Cir. 2019) (quoting *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig. (No. II)*, 892 F.3d 624, 631 (4th Cir. 2018)) (cleaned up).

<u>Analysis</u>

The Court concludes that Parrish's opinion must be excluded because it is, at bottom, grounded upon little more than "subjective belief or unsupported speculation," which will not suffice under *Daubert*, 509 U.S. at 589–90. Parrish finally reached his tepid and speculative conclusion that "it is *certainly possible* that the chimney displaced due to wind," less because he provided any basis to conclude wind caused the chimney displacement, than because Parrish believed he had ruled out certain (but not all) other potential causes. Parrish Rep. at 2 (emphasis added). However, Parrish's findings on both fronts were impermissibly speculative—both as to why he thought wind could have caused the damage, as well as why he believed certain other factors were not to blame.

Parrish's report addressed moisture as a potential factor. Notably, Parrish concluded that "[i]t is *obvious* that the OSB [sheathing] experienced long-term exposure to moisture." Parrish Rep. at 1 (emphasis added). Moreover, he was not able to say what "long-term exposure to moisture" meant, however, except to say it was "[m]ore than a few days" and "long enough to deteriorate the material." Parrish Dep. at 24–25. Therefore, while Parrish agreed that "long-term exposure to moisture" was a factor and had been there "long enough to deteriorate the material,"

he could not say whether that moisture damage occurred before any alleged wind event (indicating the existence of a structural failure), or after the alleged wind event.

Indeed, Parrish readily conceded that he was not an expert in moisture protection. Parrish Dep. at 39 (Q. "So you do not consider yourself an expert in that area?" A. "Not in moisture protection."). And when asked whether an "EIFS" system had or should have any "drainage devices," Parrish similarly disclaimed any ability to offer an opinion on the issue. *Id.* at 28 ("Again, that's getting into moisture protection. I can tell you what I think, but it's not my field of expertise."). And when asked whether "improperly installed roof flashing" was "one of the most common causes of roof leaks," again Parrish disclaimed any ability to opine on the issue: "I don't know. Again, that's moisture protection." *Id.* at 35. Plaintiffs attempt to deflect from Parrish's inability to opine on moisture protection issues, saying "Fortunately, a moisture expert is not needed in this case. This matter revolves around a structural issue." Dkt. 22 at 4. But that argument is circular and assumes the conclusion, especially where, as here, Parrish's own report acknowledges "long-term exposure to moisture" affected and deteriorated the OSB sheathing.

Parrish's conclusion began as follows: "Based on our analysis, the existing rafters are more than adequate to support design Dead and Live Loads of the faux chimney. *Since we have had no significant snow or seismic events in recent years, we conclude the damage to the roof sheathing and rafter were due to a wind event*." Parrish Rep. at 2 (emphasis added). But even according to Parrish's own opinion and analysis, he could not draw a reasoned, non-speculative logical leap from the lack of "significant snow or seismic events" to the "conclu[sion] the damage to the roof sheathing and rafter were due to a wind event." *Especially* considering Parrish's observation that it was "obvious" that the OSB sheathing had experienced "long-term exposure to moisture." And when he could not further opine on (1) how long that "long-term

exposure to moisture" and degradation was (before or after any alleged wind event); (2) whether the "EIFS" system should have had drainage device, or (3) whether an improperly installed roof flashing would have been a potential or likely cause of the roof leak.

Parrish's calculations as to whether the rafters would have supported the design "Dead and Live Loads of the faux chimney," were somewhat more substantial. However, they too betrayed a lack of consideration of numerous relevant variables in his calculations, which would have been important both with respect to the reliability of his load calculations and to support the reliability of his conclusions ruling out other potential causes of the roof damage. For instance, Parrish agreed that taught steel cables could exert additional load pressures of the roof, and that he did not try to calculate any such forces. Parrish Dep. at 23 (Q. "Is it possible that a very taut steel cable would exert additional load pressure on the roof?" A. "That's possible." Q. "And did you calculate that?" A. "No."). And Ms. Clinton agreed that the cables had been taut. Dkt. 23-1 ("Julie Clinton Dep.") at 22. Moreover, Parrish's load calculations did not account for any additional forces that would have resulted by the failure of the OSB sheathing. Parrish Dep. at 30. (Q. "And the sheathing that failed was next to an R1 rafter?" A. "Yes. The sheathing that deflected, yes." Q. "Would your dead load calculations at all be affected by the failure of the sheathing?" A. "That's a good question.  Possibly, but probably not much."). The Court also notes and finds Parrish's calculations further undermined by lack of actual measurements of the dimensions of the chimney and lack of knowledge as to construction of the chimney. *See* Dkt. 27 at 3–7; Dkt. 18 at 15–16. Parrish's failure to account for possible downward forces exerted by taut steel cables of the effect of a failure of the OSB sheathing rendered his opinion as to the load calculations unreliable—yet further undermining any conclusion  might draw that the chimney displaced due to wind.

In his report, in addition to his load calculations, Parrish noted certain other pieces of information as supporting a conclusion that wind caused the deflection. He noted that there were "no significant snow or seismic events in recent years." Parrish Rep. at 2. Fair enough, there is no dispute that snow or seismic events did not cause the damage. Parrish referenced that "a tree on the property was blown down," and that he "observed shingles and a window screen on a flat roof of the house." *Id.* But Parrish later disclaimed any reliance on the downed tree in forming his conclusions. Parrish Decl. ¶ 18. And to the extent Parrish relied on the screen and shingles found on a flat part of the roof in January 2021 to support the existence of an alleged wind event from October or even November 2020, that is highly speculative. There is no evidence from which he or the Court could reasonably conclude whether those fell earlier or later, whether they had another cause entirely, such as roof or window repair. Parrish noted that weather records did not show "any significant wind events recorded in November 2020," but continued, "that does not eliminate the possibility of a local wind event or microburst in the [area] of the house." But even if the lack or weather records did not definitely "exclude" the possibility of a "microburst," the lack of such records weighs against the possibility of the wind event, but it is not evidence that supports the possibility.

Finally, the Court notes that Parrish stated that he relied upon an "interview with Mr. and Mrs. Clinton concerning their personal knowledge of the windstorm event." Parrish Decl. ¶ 19. Parrish Rep. at 2. The sufficiency of the Plaintiffs' own testimony concerning the existence of, and impact of, the alleged windstorm will be addressed further in consideration of the summary judgment motion. But notably, Parrish's conclusion as to whether a wind event actually caused the chimney deflection was itself impermissibly speculative, stating "[w]e conclude *that it is certainly possible* that the chimney displaced due to wind." Parrish Rep. at 2 (emphasis added).

While "magic words" concerning the degree of an expert's certainty may not be required, an expert's degree of confidence must be stated to a reasonable degree of certainty such that the reliability and basis for the conclusions and methodology can be tested under *Daubert*. *See Jordan*, 2018 WL 2391999, at *6 ("The Court concludes that … there is no requirement that an expert use any 'magic words' for their opinion to be admissible," but "[t]he expert's testimony taken as a whole must still demonstrate that the expert is confident in his or her opinion to a reasonable degree of certainty."). That requisite level of confidence in the conclusions as to whether wind caused the chimney deflection is lacking from Parrish's opinion. Parrish Rep. at 2 (writing: "it is certainly possible that the chimney displaced due to wind," and saying the lack of recorded wind events "does not eliminate the possibility of a local wind event").

Critically, Parrish was not able to assess the impact of moisture deterioration or protection which he observed on the chimney displacement and roof damage, which made it "impossible for him to properly order the events in this matter." Dkt, 27 at 5–6. For all of the above reasons, the Court concludes that Parrish's opinions are speculative and insufficiently reliable. Under *Daubert*, his testimony must be excluded.

**Motion for Summary Judgment**

<u>Background</u>

The following facts are taken from the summary judgment record and are uncontested or are viewed in the light most favorable to the Plaintiffs, as the non-movants. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Plaintiff Julie Clinton testified that before the damage at issue in the case, there had only been one, small, prior roof leak five years ago that was quickly fixed and never leaked again. Julie Clinton Dep. at 9–10.

Mrs. Clinton frequently went into the attic at issue because she stored decorations in it. *Id.* at 11–12. Early in November 2020 (before November 16, when Julie called her Allstate agent to report the loss), she looked up in their formal tall living room and noticed wet stains on the ceiling. *Id.* at 13. She testified that it had been raining in the days preceding that. And that she "kn[ew] that after that terrible wind storm that we had, when [she] looked up, within days, [she] noticed that" staining and leakage. *Id.* at 14. She testified that the windstorm was "in the middle to end of October," and it was such a bad storm that "it actually took an old oak tree down that had been on [their] property the whole time 20-years plus." *Id.* at 14–15. She continued, there had been "no leaking until after that." *Id.*

After Mrs. Clinton noticed the stains, she went into the attic with her husband. *Id.* at 17– 18. They saw "water all over the floor up there," and thought the leak was "very substantial." *Id.* at 18. She thought it was substantial because "it was in the entire roof of [her] house," and "when [they] went in there, [they] could see where the water was coming in through where the chimney was and [they] knew it was a substantial issue." *Id.* at 19. Interior cables that had been holding up the roof and that had previously been taught were "slack" at that point when they noticed the leak. *Id.* at 22. She also noticed the roof sinking in, she testified, "after we had the wind and I saw the rain, yes." *Id.* There was also a crack in the rafter that hadn't been there previously. *Id.* at 23–24.

Plaintiffs reported the loss to Allstate on November 16, 2020, telling Allstate that the date of the loss was November 11, 2020. *See* Notice of Loss. Allstate subsequently denied the claim, stating that the chimney wasn't correctly built. Julie Clinton Dep. at 25–26. The Clintons secured the report of an independent engineer to review the matter, Mr. Parrish. *Id.* at 28. Plaintiffs

understood Parrish's completed report to say that he believed that the wind had shifted the chimney. *Id.* at 29.

Mr. Timothy Clinton also testified at a deposition. He testified that they had first noticed water damage in early November 2020. Dkt. 23-2 ("Tim Clinton Dep.") at 14–15. His wife told him that "the ceiling was wet and you could see the streak in the ceiling." *Id.* at 15. Mr. Clinton testified that it was raining that day, and that it was wet and so they began to put down towels. *Id.* at 15–16. Mr. Clinton didn't remember whether there was any wind that day, but he did think that he remembered in October that there was "a very significant event … it was like insane." *Id.* at 16. He remembered that the windstorm had taken down an oak tree. *Id.* However, he did not recall the precise day in October of this windstorm.

In Mr. Clinton's deposition, Allstate's counsel asked him to comment on the following discovery response from Plaintiffs: "Plaintiffs are not completely sure how the occurrence took place, as lay people; but, according to their engineer named herein, the chimney was displaced due to wind and this displacement damaged flashing which then allowed water to intrude in their home." *Id.* at 18; Dkt. 20-2 at 8 (discovery response). Mr. Clinton testified in response that he believed that to be true, "there was a windstorm that was significant, that took down that big oak tree, and [he] believe[d] that what may have happened is that wind somehow impacted that chimney because of where it's located and it created some type of occurrence." Tim Clinton Dep. at 18. He continued, "All I know is that prior to that time we did not have any problem up there with any water issues at all and even since then we have." *Id.* Later he testified again about the wind event that "hammered our place," and he stated that "we somehow feel that what took place displaced that chimney which ultimately then led to the damage that occurred in our home." *Id.* at 19.

15

Allstate's expert Andrew Stewart, a forensic engineer, conducted a study of Plaintiff's residence on December 10, 2020. *See* Dkt. 20 at 5–6. Mr. Stewart observed black staining on the OSB sheathing supporting the false chimney, which based upon studies, he concluded that the sheathing had been subject to long-term fungal decay and deterioration. Dkt. 20-6 ("Stewart Dep.") at 14, 17–19. Stewart concluded that "the weight of the chimney, plus the force imposed on the rafter by the steel cables that hold the chimney down, plus the failure of the sheathing caused by long-term fungal decay caused the failure of the rafter." *Id.* at 15.

Stewart also concluded that wind did not cause the displacement of the chimney or the failure of the rafter. *Id.* at 16. In support of that conclusion, Stewart reported that the weather data did not show days of high wind speeds in the area. *Id.* at 16–17. To be sure, Stewart conceded those weather records could have differed from the precise spot where the Clintons' home is located, however. *Id.* at 17. Stewart testified that his observations of staining and fungal decay were not consistent with just a few weeks of wetting. *Id.* at 19. Stewart also explained that he found "multiple deficiencies in the faux chimney installation and the flashing upslope and around the perimeter of the chimney." *Id.* at 29. These included "multiple avenues for water intrusion in that construction" that Stewart concluded were "installation deficiencies which caused the water intrusion initially and ongoing." *Id.* Stewart also explained that the "EIFS needs to have a drainage provision," and "there were no draining provisions in the EIFS on this faux chimney." *Id.* at 30. And Stewart explained that further loads were pressing down upon the rafters from "[t]he steel cables that tightened the chimney down to the roof," *id.* at 31.

As explained above, Plaintiffs also sought an expert report from Parrish. As recounted above, Parrish concluded that "the existing rafters are more than adequate to support design Dead and Live Loads of the faux chimney." Parrish Rep. at 2. He concluded, based on that

calculation and the lack of significant seismic or snow events in the area, that the "damage to the roof sheathing and rafter were due to a wind event." *Id.* Elsewhere, he concluded that "it is certainly possible that the chimney displaced due to wind, and this displacement damaged flashing, allowing water intrusion." *Id.* For the reasons stated above, the Court has concluded that Parrish's testimony did not suffice under *Daubert* and is therefore inadmissible.

<u>Applicable Law</u>

1. *Standard of Review*

Summary judgment is appropriate if the pleadings and evidence show that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). The nonmoving party must "show that there is a genuine dispute of material fact ... by offering sufficient proof in the form of admissible evidence." *Id.* (quoting *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)). The district court must "view the evidence in the light most favorable to the nonmoving party" and "refrain from weighing the evidence or making credibility determinations." *Id.* "Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

17

2.  *Virginia Law on Proof of Coverage*

"Under Virginia law, the insured bears the burden to show that its loss is covered by the policy." *Dairy Energy, Inc. v. Hartford Steam Boiler Inspection & Ins. Co.*, 566 F. Supp. 3d 515, 523 (W.D. Va. 2021). If that is shown, the insurer has the burden to establish that an exclusion applies to bar coverage. *See id.*; *S.A. Corp. v. Hartford Cas. Ins. Co.*, No. 1:15-cv-71, 2015 WL 12516794, at *4 (E.D. Va. June 3, 2015); *U.S. Life Ins. Co. v. Mason*, 200 S.E.2d 516, 517 (Va. 1973). Because all-risk insurance cover all losses except specifically excluded events, an insured has the initial burden to establish that the loss was fortuitous, and then the insurer bears the burden of establishing that an exclusion applies. *See Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 506 F. Supp. 3d 360, 371 (E.D. Va. 2020).

3.  *Policy Language*

**Losses We Cover Under Coverages A and B:**

**We** will cover direct physical loss to property described in **Dwelling Protection-Coverage A** and **Other Structures Protection-Coverage B** except as limited or excluded in this policy.

\*\*\*

In addition, under **Dwelling Protection-Coverage A** and **Other Structures Protection-Coverage B** of this policy, **we** do not cover loss caused by any of the following. However, any ensuing loss to property described in **Dwelling Protection-Coverage A** and **Other Structures Protection-Coverage B** not excluded or excepted in this policy is covered:

1.  a) Wear and tear, marring, scratching, deterioration, inherent vice, or latent defect;

    b) Mechanical breakdown;

    c) rust, mold, wet or dry rot;

    d) contamination;

    e) smog, smoke from agricultural smudging and industrial operations;

f) settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings;

g) insects, rodents, birds or domestic animals ….

h) seizure, confiscation or quarantine by civil, governmental or military authority.

Dkt. 20 at ECF p.8.

Analysis

Upon consideration of the summary judgment record and viewing the record in the light most favorable to Plaintiffs as the nonmovants, the Court concludes that there is no genuine dispute of material fact Plaintiffs have not met their initial burden to establish a prima facie case that this was a fortuitous loss, caused by a wind event. *See Elegant Massage, LLC*, 506 F. Supp. 3d at 371 (stating that, because all-risk insurance cover all losses except specifically excluded events, an insured has the initial burden to establish that the loss was fortuitous, and then the insurer bears the burden of establishing that an exclusion applies). In any event, even if Plaintiffs were able to succeed on that initial burden (and they have not), the Court further concludes that Allstate has demonstrated that there is no genuine dispute of material fact that an exclusion applies, namely that Plaintiffs' water damage was caused by "wear and tear, marring, scratching, deterioration, inherent vice, or latent defect," the Exclusion 1a, and that the water damage was caused by "wet rot" under Exclusion 1c.

Indeed, Plaintiffs' own discovery responses demonstrate that they are unable to create a genuine dispute of material fact that the damage to their home was caused by a fortuitous loss, namely, a windstorm. Plaintiffs have acknowledged "[they] are not completely sure how the occurrence took place, as lay people; but, according to their engineer named herein, the chimney was displaced due to wind and this displacement damaged flashing which then allowed water to intrude in their home." Dkt. 20-2 at 8. However, for the reasons stated above, Plaintiffs' expert

Mr. Parish's opinions as to displacement due to wind were speculative, unreliable, and not stated with the minimum certainty required of expert opinion. *See* Parrish Rep. at 2 ("We conclude that it is *certainly possible* that the chimney displaced due to wind…") (emphasis added). The Court has excluded Parrish's testimony as inadmissible under *Daubert* and so neither could that constitute admissible evidence that would support Plaintiffs' opposition to summary judgment. Evidence "which is inadmissible at trial[ ] cannot be considered on a motion for summary judgment." *Maryland Highways Contractors Ass'n, Inc. v. State of Md.*, 933 F.2d 1246, 1251 (4th Cir. 1991) (citations omitted); *see also Marsh v. W.R. Grace & Co.*, 80 F. App'x 883, 888 (4th Cir. 2003) (unpublished) (affirming award of summary judgment to defendant where only evidence with respect to one element of plaintiff's claim, proximate causation, was plaintiff's expert testimony, but "[w]ithout that evidence, the plaintiffs' case [was] devoid of the proximate causation element").

However, even if the Court had not excluded it, Parrish's testimony would not create a genuine issue of material fact for the same reasons. Indeed, for his part, Mr. Parish had mostly relied on Plaintiffs' own description of a windstorm, aside from his now-disclaimed reliance on a fallen tree and a screen and shingles. Plaintiffs' testimony that the windstorm caused the damage is also speculative and, without assistance from expert conclusions, it is no more than a scintilla. Indeed, Plaintiffs largely disclaimed the ability to themselves demonstrate a causal connection between the windstorm and the chimney displacement. Dkt. 20-2 at 8 (discovery response). In any event, Mrs. Clinton testified that there was a windstorm in the middle to the end of October 2020. Julie Clinton Dep. at 14–15. Mr. Clinton also testified that there was a "very significant" wind event in October 2020. Tim Clinton Dep. at 15–16. Both testified that an oak tree on their property (not near the house) had fallen after the storm. *See id.* And, besides some small water

intrusion previously which did not appear to be related, they testified were no similar events or significant leaks or roof damage until one day—between "early in November" to November 11, 2020 (the date of the reported loss)—Mrs. Clinton had noticed the substantial amount of water pouring in from the roof where she saw the displaced chimney and water flowing in from rain.

The Court is required to accept the truth of the testimony and draw all reasonable inferences in Plaintiffs' favor, as nonmovants, notwithstanding contrary evidence. However, accepting the fact that a windstorm occurred within this period of time before the damage to their home does not create a genuine issue of material fact that the windstorm *caused* the damage. Taking such a logical leap would be an excessive, unwarranted inference in Plaintiffs' favor— one predicated on the logical fallacy that just because B followed A in time, that must mean that A *caused* B. *Cf. Westberry*, 178 F.3d at 265 (explaining that "the mere fact that two events correspond in time does not mean that the two necessarily are related in any causative fashion"); *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 885 (10th Cir. 2005) ("A correlation does not equal causation."). Plaintiffs have not put forward such evidence as would support the existence of a genuine issue of material fact that they met their burden to establish prima facie showing that the windstorm caused the damage to their home.

In any event, Allstate has demonstrated that there is no genuine dispute of material fact that Plaintiffs' water damage was caused by wear and tear, marring, scratching, deterioration, inherent vice, or latent defect, under Exclusion 1a, as well as wet rot under Exclusion 1c. Plaintiffs' expert's testimony is inadmissible, but in any event, it does not create a genuine dispute of material fact on the issue. After all, Parrish acknowledged repeatedly that he was not expert in moisture protection. *E.g.*, Parrish Dep. at 28, 35, 39. (But even Parrish found it "obvious" that "the OSB [sheathing] has experienced long-term exposure to moisture." Parrish

Rep. at 1.) For his part, Allstate's expert, Mr. Stewart, has offered undisputed expert testimony that the black staining on the OSB sheathing supporting the false chimney, based upon studies, had been subject to long-term fungal decay and deterioration. Stewart Dep. at 14–15, 17–19. That meant more than a few weeks. Stewart also opined that the EIFS system lacked the requisite proper drainage, *id.* at 30, which was another moisture protection issue about which Parrish disclaimed expertise, Parrish Dep. at 28. Stewart concluded that "the weight of the chimney, plus the force imposed on the rafter by the steel cables that hold the chimney down, plus the failure of the sheathing caused by long-term fungal decay caused the failure of the rafter." *Id.* at 15. This evidence stands uncontradicted. Against it, Plaintiffs offered nothing more than speculation or a scintilla of evidence. In this case therefore Allstate has demonstrated there is no genuine dispute of material fact that the lack of such a drainage system constituted a "latent defect" or "inherent vice" under the language of Exclusion 1a, damages from which Allstate did not provide coverage. Moreover, Allstate has provided evidence such as demonstrates there is no genuine issue of material fact that the damage to Plaintiffs' home was caused by "wet rot," under Exclusion 1c. *See* Dkt. 20 at 13–14.

Conclusions

For these reasons, the Court will grant Allstate's motion to exclude Plaintiff's expert, and grant Allstate's motion for summary judgment, in an accompanying order to follow.

The Clerk of Court is directed to send this Memorandum Opinion to the parties.

Entered this  30th  day of September, 2022.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE